George F. SULLIVAN, Plaintiff,

v.

Daniel J. BOORSTIN, Defendant.

Civ. A. No. 77–1923.

United States District Court, District of Columbia.

Feb. 15, 1980.

Neil B. Katz, Shalon Ralph, Chevy Chase, for plaintiff.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This action is brought by plaintiff, George F. Sullivan, Jr., a 42 year old black male, for redress of alleged discrimination in Government employment, based on "race, color and sex" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended, the fifth amendment to the Constitution of the United States and the regulations of the Library of Congress. Plaintiff was involuntarily separated from his position with the Library and seeks immediate reinstatement, accrued back pay, reasonable counsel fees and costs of this action.

The defendant, Daniel J. Boorstin, Librarian of Congress, has been sued in his official capacity.

Plaintiff was employed by the Library from September 22, 1969, until his dismissal under adverse action procedures some seven years later, on July 30, 1976. At that time Mr. Sullivan was a GS–5 Production Assistant Arranger, Processing Department, Catalog Publication Division.

The notice of adverse action gave as its basis an incident which occurred on January 22, 1976 between the plaintiff and his supervisor of many years, Nathaniel Rushing, also a black male.

A brief recitation of this matter will illuminate the situation as it evolved and then terminated in plaintiff's dismissal.

The Catalog Publications Division, where the plaintiff was employed, was located in the 200 block of Massachusetts Avenue, N.E., in the District of Columbia and was not part of the main Library of Congress complex. Employees, including the plaintiff, who worked at that location and who drove to work had difficulty finding parking spaces in the general vicinity. As a custom, they would park on adjoining streets where parking was prohibited after 4:00 p.m. In order to accommodate employees faced with this dilemma, it had become customary for the supervisors to permit the employees the necessary time around 4:00 p.m. to leave work, move their vehicles, and then return before the daily departure time of 4:30 p.m. According to the plaintiff this procedure usually took no more than ten to fifteen minutes.[1] He states that this was

---

1. Irrelevant to the decision, yet a matter of considerable concern, was the testimony that a majority of the Library's employees engage *daily* in the officially sanctioned loss of "ten to

the situation on January 21, 1976 when he contends he did return to the building, thereafter, but because of certain personal necessities did not stay in the main room where he performed his work; he left the building shortly prior to his required termination time, having completed his quota of work assigned for that date in less than eight hours. When plaintiff arrived at work the next morning he was encountered by Mr. Rushing who insisted that plaintiff had not returned to work on January 21 after leaving at 3:55 p.m. and that he was, therefore, required to complete a leave slip for one hour.[2] Although in general the relationship between the two men had been an amicable one and plaintiff was a very good employee with no prior disciplinary problems, there had been prior difficulties with plaintiff in a similar regard several times the past month. Plaintiff refused to sign the leave slip. The discussion continued between the two men which ended in a physical fight. Plaintiff contends that it was the supervisor who "attempted to push me out of his face" and "raised off the boxes (on which he was sitting) as if to put his hands on my chest." The supervisor challenges that statement and contends that it was the plaintiff who was the aggressor and that he, Mr. Rushing, did not hit plaintiff who was younger, 6′3″ and 190 pounds since he knew that "I could get cut or I could bleed to death." The fight terminated when the supervisor, on the floor with the plaintiff, was able to attract the attention of a passerby who sent a security guard to terminate the melee. The plaintiff thereupon advised Rushing to the effect that the fight would finish later outside after work.

Mr. Rushing sustained swelling, abrasions and bleeding around the face and left eye and upon the urging of Mrs. Gloria Hsia, Chief of the Catalog Publications Division, to whom he promptly reported the assault, he received medical attention from the Library's nurse and outpatient treatment at a local hospital.

Mrs. Hsia, female and Oriental, was particularly concerned about the incident because of her knowledge of Mr. Rushing's recent serious health problems. He had been hospitalized a few weeks earlier for both a hernia operation and pulmonary embolism and was on medication to avert potential blood clotting problems. (The plaintiff, having visited Mr. Rushing at the hospital, was also aware of his supervisor's medical situation.)

Confronted with plaintiff's denial of the fight despite Rushing's statement and appearance, plaintiff's allegation that he frequently "played" with his supervisor in this manner, his suggestion that Rushing's wound was "self-inflicted, or accidental or probably reopened an old wound", the nurse's affirmance that this was a fresh wound, the concern about Rushing's general health, the threat to finish the fight outside after work, and Mr. Sullivan's belligerence at that time, Mrs. Hsia placed plaintiff on "suspension" to return the next day when calmer. Plaintiff complained to the Employee Relations Office which placed him on leave with pay that day.

The next day plaintiff discussed the matter with Patrick Bernard and Glen A. Zimmerman, two Library officers from the processing department who were investigating the matter. As a result of this, Mr. Sullivan was assigned to a detail at another Library location while the investigation continued.

On February 20, 1976, after both plaintiff and Mr. Rushing had been each interviewed

fifteen minutes" for the same personal business (leaving the building, walking to the automobile, removing the automobile to a "legal" location and returning to the Library with resumption of duties in the few minutes before official termination time). The employees spill out of the work area almost simultaneously and government business comes to an abrupt halt. The Court recommends an investigation by the Librarian to determine whether this practice is as widespread as the undisputed testimony demonstrated (and not just limited to the necessary exceptional circumstances) and to ascertain whether these Library employees are receiving disparate perquisites from other Government employees.

2. Leave is taken in increments of one hour.

on three occasions, Mrs. Hsia issued a Notice of Proposed Adverse Action to the plaintiff pursuant to Library of Congress Regulation 2020–2, stating that she was recommending his removal from Library employment on the basis that all data summarized in that notice conclusively established that the plaintiff had assaulted his supervisor without provocation:

A supervisor, in discharging his duties, should not be subject to physical abuse from a staff member. The Library has a responsibility to the supervisor who sincerely tried to enforce regulations and did so in a reasonable manner. Mr. Sullivan claims no memory of hitting Mr. Rushing, and he shows no remorse for the incident. If Mr. Sullivan were to make a physical attack upon Mr. Rushing, another supervisor, or a co-worker at sometime in the future, the bodily harm inflicted could be even more serious. In this instance an employee of greater strength struck a recently hospitalized supervisor when the issue was one hour of annual leave.

Because of Mr. Sullivan's own admissions about the events of January 21, 1976, because of the inconsistencies in his statements, his threat in the presence of Officer Deloatch, and the actual injuries suffered by his supervisor, it is necessary that he be removed from the Library. (Plaintiff's Ex. 1; Defendant's Exhibit D).

At the time of this proposed adverse action Mrs. Hsia, with her 20 years employment by the Library, was unaware of any prior, similar instance of an employee striking his supervisor.

Pursuant to Library of Congress Regulation 2020–2 the matter was then referred to a Reply Officer, Ms. Patricia S. Hines. On the basis of her review and independent investigation, on May 5, 1976 Ms. Hines concluded that plaintiff did strike his supervisor and that the adverse action, as proposed, was valid. In consideration of the absence of prior serious disciplinary problems and plaintiff's years of fully acceptable work and good attendance, Ms. Hines recommended a maximum thirty days' sus-

pension, probation for one year and transfer to another department in lieu of the finality of dismissal.

The final decision was made on June 28, 1976 by Joseph H. Howard, Director of the Processing Department, who decided that the reason stated in the Notice of Proposed Adverse Action was fully supported by the evidence, warranting his removal from Library service effective July 30, 1976.

The plaintiff appealed and in addition contacted the Equal Opportunity Office in July 1976 alleging discrimination primarily because he was "black and male." After the matter could not be resolved informally, Mr. Sullivan filed his formal complaint on August 9, 1976 charging discrimination on the basis of race (black), color (black), religion (Protestant), national origin (American) and sex (male). Alleging conspiracy to have him fired, he named as the charged parties Gloria Hsia (oriental, female); the division chief, Joseph H. Howard (white, male); the department executive officer, Joan Van Blake (black, female), P. Edlin, an executive assistant in the department; and Kay Wexler (black, female), the assistant division chief. A full scale investigation was instituted.

Contemporaneously plaintiff proceeded on his adverse action appeal. A hearing was conducted on October 26, 1976 by an outside hearing officer who concluded that plaintiff had engaged in the conduct upon which his removal from employment was predicated and that the conduct warranted removal. He found in summary, that management had the "acknowledged right to maintain a safe place for its employees to work and to insure effective supervision and work production."

On January 10, 1977 the Librarian issued a final agency decision concurring in the findings and recommendations of the hearing officer and upholding the prior removal of plaintiff from his employment at the Library.

Several months later, on October 5, 1977, an Equal Opportunity Officer (EOO), Leneice N. Wu, submitted a detailed investigatory report noting that there was no evi-

dence of any collusion to cause the plaintiff's discharge. Officer Wu examined incidents and types of disciplinary actions taken by the Library from the period 1973—January 30, 1976, with an update concerning a 1974 matter involving a black supervisor and a white subordinate (later referred to as the Richardson/Roberts matter) and two instances in 1977 concerning two different pairs of black females.

It should be highlighted that the above incidents involving females are the focus of plaintiff's assertions of "sex discrimination" because, he alleges, these females were not dismissed, as he was, but merely received written reprimands. On June 20, 1977, two black females, one a GS–4 and the other a GS–7, were both given informal warnings for fighting; on June 24, 1977, a black female (GS–1) was given an informal written warning for fighting with her supervisor, a black female, GS–7. The supervisor also received an informal written warning. Both incidents occurred subsequent to the plaintiff's altercation with his supervisor, in different departments with different personnel under different circumstances and with no attempt to even compare those situations with the present one. Although EOO Wu did not find sufficient evidence to support "outright discrimination beyond a reasonable doubt" on any of plaintiff's bases, she was not satisfied that the Library's actions were totally nondiscriminatory because of the severity of the penalty in Mr. Sullivan's case. She recommended, therefore, that plaintiff be reinstated after a one-year suspension to be followed by probation of one-year with transfer to another division or department.

The Equal Opportunity Coordinator Brackeen and another EOO, Beatrice H. Jones, concurred in these findings and recommendations. EOO Langone submitted a separate written report, because of his concern that it be clear that the jurisdiction of the Equal Opportunity Office extended to discriminatory actions only and not to the appropriateness of the penalty imposed. He examined a compilation of all then known cases of employees fighting with each other or with supervisors and concluded that eight black persons and one white male received lesser punishment than plaintiff, and that males and females were treated the same. He found no discrimination involving Mr. Sullivan.

On October 28, 1977, the Director, Management Policy Office, reviewed the entire file and concluded that the complaint of discrimination was not sustained. Plaintiff appealed and filed the instant court action.

On June 15, 1979, Hearing Examiner Walter C. Wallace, appointed pursuant to procedures of the Federal Mediation and Conciliation Service, submitted a twenty-two page report (with a twenty-two page attachment, of the Advisory Decision in the matter of Richardson/Roberts), recommending that the complaint be dismissed, "there being no merit whatsoever to [Mr. Sullivan's] allegations that he was discharged because of unlawful discrimination based on his race and sex."

Acting Librarian of Congress William J. Welsh concurred on July 10, 1979 in Hearing Examiner Wallace's findings of no discrimination and adopted his recommendations that the appeal be dismissed.

It is the plaintiff's position, despite the multiple investigations, reviews and reports to the contrary, that he did not initiate the altercation and that that conclusion was hastily arrived at.

It is evident that plaintiff "gave varying accounts of the encounter and displayed a somewhat surprising lack of memory as to crucial matters . . . [and that] Rushing at all times gave consistent accounts of the encounter . . . Important also is the fact that independent/review evaluations of the incident [by Gloria Hsia, Patricia Hines, Joseph Howard, and Arnold Ordman, Arbitrator] reached the same result that plaintiff perpetrated the assault against his supervisor," Report of Hearing Examiner Wallace. The Equal Opportunity Officers did not disagree with this assessment. Hearing Examiner Wallace adopted the Arbitrator's findings.

The record, the Court finds, fully supports the Library's conclusions, as recited by the Arbitrator and reaffirmed by the Hearing Examiner. These conclusions were reached by investigation and reason and were fully reaffirmed through the course of testimony at this trial, and accepted by the Court with its independent opportunity to assess credibility. Clearly, it was the younger, bigger and aggressive plaintiff who initiated the altercation, fostered injuries on his supervisor who was recuperating from serious recent hospitalization, a fact well known to plaintiff, and it was plaintiff who threatened to finish the fight later that date.

Plaintiff also questions the absence of guidelines/penalty charts since the Library, at all times relevant to this action, determined each adverse action by the individual merits of the case without recourse to any comparable incident/penalty table. The plaintiff asserts that this procedure tends to encourage *ad hoc* decisions and increase the potential for disparate treatment. He has failed completely however to show that the result would have been different in any respect had there been such comparative tables. Mrs. Hsia was unaware of the Richardson/Roberts case at the time she made her decision of proposed adverse action; in light of her present knowledge she finds the two cases different. Mr. Howard, who did not know Mr. Sullivan is black, first learned of the Richardson/Roberts case at the time of the EEO complaint and after his decision was made. Officer Wu referred to the Richardson/Roberts case in her report; concurring Officer Beatrice Jones was aware of the case and that the penalty in the case was very minor; another EEO, Stephen Langone, discussed and distinguished it in his separate report. Hearing Examiner Wallace minutely examined the Richardson/Roberts case. None found any discrimination.

The essential contention of plaintiff was that disparate treatment equivalent to discrimination occurred here because a harsher penalty was inflicted on plaintiff in a "comparable situation" than that imposed on a white employee. That other case relied on to establish this disparity was the Richardson/Roberts case. An examination of the two cases becomes appropriate.

The essential facts involved a fight in June 1974 between Gordon A. Richardson, a white male employee of the Library, and his supervisor, Herbert O. Roberts, a black male. Richardson had previously had at least one argument with Roberts. A three-member panel investigated the facts of the fight, found that Richardson had assaulted his supervisor, striking the first blow with force. The supervisor, however, demonstrating "exceedingly poor supervisory judgment", provoked his subordinate and "in large measure precipitated the fracas." An official reprimand and transfer were recommended; subsequently, reprimands were deleted from both files and yet later Mr. Roberts received even more supervisory responsibility than he had had prior to the incident.

Hearing Examiner Wallace after a scrutinized review of the arbitration report of the Richardson/Roberts case, and after a complete exposition of the instant matter, both sides being represented by counsel and testimony having been taken [including that of six witnesses who testified before this Court], found that the fight in the Sullivan case and the fight in the Richardson/Roberts case were not comparable. The Court agrees with Mr. Wallace's analysis that the instant case

> involved an unprovoked assault where there was no provocation, no justification, and no mitigating aspects for the wrongful act. Moreover, the fact [Mr. Sullivan] knew that the supervisor was in poor health and recently discharged from the hospital, tends to establish the aggravated nature of this attack. (Defendant's Exhibit W, p. 16)

Consider lastly the persuasive testimony of Ms. Patricia Hines, plaintiff's final [rebuttal] witness, who had recommended a lesser penalty:

> I did not find any evidence of discrimination. . . . Although I was not requested to investigate discrimination as

such, I was an Equal Employment Opportunity Officer for years and would have noted this if I had found it.

■ The above record is susceptible of but one conclusion: there has not been disparate/discriminatory treatment of Mr. Sullivan as a result of his race, color or sex.

■ It is basic that it is unlawful for an employer to discharge an employee because of race, color, religion, sex, or national origin. When Title VII was amended by the Equal Employment Opportunity Act of 1972, Pub.L.No.92–261, employment discrimination suits could be initiated thereunder against the federal government. In order that plaintiff prevail in this Title VII action, as a member of an unquestioned protected class, he must carry the initial burden of establishing a *prima facie* case of racial and/or sex discrimination, and establish by a preponderance of the evidence that the Library discharged this black, male, plaintiff employee because of his race and/or sex. *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 281–85, 96 S.Ct. 2574, 2579–81, 49 L.Ed.2d 493 (1976). This causal connection may be proved by demonstrating "disparate treatment", defined by the Supreme Court in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977):

> [A] disparate treatment '* * *' is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. [citation omitted] Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. * * *

Disparate treatment is usually illuminated by the use of comparative evidence. It is not unlawful for example to treat persons unfairly, if all persons are similarly treated, see, e. g., *Morita v. Southern Cal. Permanente Medical Group*, 541 F.2d 217, 218–20 (9th Cir. 1976) *cert. denied*, 429 U.S. 1050, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977). The Act proscribes *all* discrimination in employment ". . . and while crime [and] other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination", *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S., at 283, 96 S.Ct., at 2580.

■ Although an employer has an unquestioned right to consider all the facts, determine the measure of punishment and indeed terminate an employee for "good reason, bad reason or no reason at all absent discrimination", *Harper v. TWA*, 385 F.Supp. 1001, 1004 (E.D.Mo.1974), *aff'd* 525 F.2d 409 (8th Cir. 1975); *Tims v. Board of Education of McNeil, Arkansas*, 452 F.2d 551, 552 (8th Cir. 1971), where the same employee misconduct exists, the penalty must be applied without discrimination, *McDonald v. Santa Fe Trail Transportation Co., supra. See also, Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976).

It is recognized that "precise equivalence and culpability between employees is not the ultimate question", and evidence that an employee of a different race was involved in an act of "comparable seriousness" against the employer, but nevertheless received a lesser punishment, is sufficient to express the problem of "dissimilar employment discipline", *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. at 283, n.11, 96 S.Ct. at 2580, n.11.

Here, Mr. Sullivan's unwarranted and unprovoked assault on his supervisor merited severe punishment.

■ Although the finality of dismissal might, at first examination, seem unduly harsh it is not for the Court to decide whether another reasonable person might, on reflection, have come to a different *penalty* conclusion. The issue here is whether *discrimination* occurred and, if so, whether that discrimination was as a result of the plaintiff's race, sex, or color. Absent dis-

crimination, the choice of discipline is a matter left to the employer's best business judgment in light of all considerations.

The record is completely devoid of any evidence concerning sex discrimination and the Court concludes that the plaintiff has failed to establish even a *prima facie* case that he was discharged on the impermissible basis of sex discrimination.

As to the remaining allegation of discrimination, at trial and again now, the Court is hard pressed to find a *prima facie* case as to racial discrimination. This case and the Richardson/Roberts matter on which plaintiff puts his foundation were not comparable.

Even assuming arguendo plaintiff made a *prima facie* case of racial discrimination, the defendant Library resolutely shouldered its shifted burden to articulate legitimate, nondiscriminatory reasons for Mr. Sullivan's discharge, regardless of the disparities and prior penalties imposed for fights between different Library employees in different departments, under different circumstances, with different reviewers and evaluators. The Library has totally rebutted whatever *prima facie* case, if any, was made. *McDonnell Douglas v. Green, supra.*

Once defendant's action was shown to be nondiscriminatory, then the burden of persuasion returned once again to plaintiff to demonstrate that the Library's assigned reason for discharge was pretextual or discriminatory in application. The plaintiff could not, and did not, support his burden here. The record provides overwhelming testimonial and documentary substantiation that the discharge was not based on sexual or racial considerations and/or discrimination.[3]

Plaintiff, in sum, has not proven that defendant violated Title VII of the Civil Rights Act of 1964, as amended.

Judgment shall be entered in favor of the defendant and plaintiff's complaint dismissed.

---

3. Plaintiff's invocation of an additional statutory ground for review of his dismissal from employment with the Library, an "adverse action" claim under 5 U.S.C. § 7512, was dismissed October 19, 1978 by the Honorable Thomas A. Flannery, to whom this cause was previously assigned. Judge Flannery determined the amount in controversy exceeded the limitation of $10,000 imposed by the Tucker Act, 28 U.S.C. § 1346(a)(2) and that, accordingly, exclusive jurisdiction as to that monetary relief is vested in the Court of Claims.