**Barbara W. LEVITT,**
**Plaintiff-Appellant,**

v.

**UNIVERSITY OF TEXAS AT EL PASO, et al.,**
**Defendants-Appellees.**

No. 87–1182.

United States Court of Appeals, Fifth Circuit.

June 16, 1988.

Rehearing Denied July 19, 1988.

Elwyn Lee, Houston, Tex., for plaintiff-appellant.

Barbara W. Levitt, pro se.

Don Branson, Olivia B. Ruiz, Asst. Attys. Gen., Austin, Tex., for defendants-appellees.

Before BROWN, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Barbara Levitt is the widow of Dr. Leonard Levitt.[1] Dr. Levitt was dismissed from employment as a tenured professor of chemistry at the University of Texas at El Paso (UTEP) for misconduct consisting of alleged advances toward one or more of his female students at the university.[2]

Dr. Levitt brought suit against UTEP and two of its employees in the District Court on March 28, 1983 *Levitt I.* Judgment was entered in favor of UTEP and both individual defendants on July 17, 1984. 590 F.Supp. 902. We affirmed. 759 F.2d 1224 (5th Cir.1985), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). On March 18, 1985, while his appeal from *Levitt I* was pending, Dr. Levitt brought the instant suit *Levitt II* against UTEP and 22 individual defendants, also arising from the termination of his employment at UTEP. The District Court granted defend-

---

1. Dr. Levitt died on May 24, 1986, and Barbara Levitt was substituted for him as a party under F.R.Civ.P. 25(a)(1) on September 10, 1986. She was represented at oral argument in this case, but filed her brief *pro se.*

2. At the time, UTEP had an official, written, and internally-published policy concerning and forbidding sexual harassment which had been in place since at least June 24, 1981. That policy statement was reissued periodically, but its substance changed little if any from year to year. The version dated June 24, 1981 reads:

   The University of Texas at El Paso is committed to the policy of providing equal opportunity and treatment in the administration of all its educational policies and employment practices, and in the conduct of all University programs or activities, without regard to race, color, national or ethnic origin, religion, age, sex, handicap, or veteran status. Sexual harassment is a form of sex discrimination, and therefore as such, it cannot be tolerated. The University must take disciplinary action against individuals who fail to follow this policy of equal opportunity and treatment. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical con-

duct of a sexual nature have been defined to constitute sexual harassment when:

1. The submission by an employee or student to such conduct is made either explicitly or implicitly as a term or condition of employment or scholastic achievement.
2. The submission to or rejection of such conduct by an employee or student is used as the basis for employment or scholastic decisions affecting that individual.
3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or offensive working or scholastic environment.

   Complaints of sexual harassment should be made orally, or in writing, to the E.E.O. Officer, Room 211A, Administration Building ...[.] To the extent possible, information about each complaint will be kept privileged and restricted to those who need to be informed in order to achieve a timely resolution of the complaint. Harassment of any person making a discrimination complaint is illegal.

   The statement was signed by Dr. Haskell Monroe, the president of UTEP.

ants' motion to dismiss with respect to only the individual defendants on grounds of res judicata, or claim preclusion. The court later granted UTEP's motion to dismiss the case against it on grounds of collateral estoppel, or issue preclusion, in light of *Hirst v. State of California*, 770 F.2d 776 (9th Cir.1985). From that order, Levitt appeals. We affirm.

### At the Threshold

In February 1982, a nursing student enrolled in one of Dr. Levitt's chemistry classes complained that he had made offensive advances toward her.[3] Dr. Olander[4] received that complaint and—after consultation with the University president, Dr. Monroe—decided to offer Dr. Levitt the opportunity to resign. Dr. Levitt refused. The University then began formal proceedings to terminate his employment.

In accordance with UTEP's rules, Dr. Monroe selected a five-member tribunal of other UTEP faculty members. That tribunal held a hearing during August and September of 1982, during the course of which Dr. Levitt testified under oath that certain University administrators had brought false charges against him, and that these administrators were actually motivated by bias and prejudice against Levitt because he was Jewish.

The tribunal considered Dr. Levitt's testimony and all the other evidence before it, and concluded that Dr. Levitt had indeed made improper advances toward female students enrolled in his classes on several occasions. The tribunal rejected Dr. Levitt's contention and made a unanimous finding that good cause existed for the termination of his employment. In accordance

with its recommendation, he was dismissed on December 3, 1982.

Subsequently, Dr. Levitt filed suit in the Western District of Texas on March 28, 1983 *Levitt I*. In his complaint—filed with the assistance of counsel—Dr. Levitt asserted that his termination from employment at UTEP was "contrary to law." The only ground upon which he based that assertion was that the procedures followed by the university deprived him of his right to due process. He pleaded a cause of action under 42 U.S.C. §§ 1983, 1985, and 1988, and the Fourteenth Amendment.

Dr. Levitt claimed in *Levitt I* that he had been denied due process in five respects: (i) he was not given adequate notice of the cause of his termination; (ii) he was denied the right to confront the witnesses against him; (iii) he was denied the opportunity to be heard; (iv) the special tribunal appointed to hear the charges and evidence against him did not give to him a statement of the reasons for termination found by the special tribunal; and (v) two members of the tribunal, Dr. Harris and Dr. Fuller, were prejudiced against him and he was thereby denied the right to a hearing before an impartial tribunal.[5] On December 29, 1983, the District Court granted UTEP summary judgment with respect to the first four of these contentions.[6] A trial was held on the fifth claim on July 2, 1984. On that claim, judgment was entered in favor of UTEP and both Dr. Harris and Dr. Fuller, on July 17, 1984. 590 F.Supp. 902. This court affirmed. 759 F.2d 1224 (5th Cir.1985), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985).

---

3. When the story of her complaint appeared in the UTEP student newspaper, three other former students of Dr. Levitt came forward to report that Dr. Levitt had made offensive advances toward them also.

4. Olander was the Vice-President of Academic Affairs at UTEP at the time Dr. Levitt was dismissed. Olander was responsible for the department, and had received the complaint of harassment against Dr. Levitt and had initiated action. In 1981, Dr. Levitt had two disputes with Olander. The first of those concerned an internal faculty wrangle over the removal of

James Zajick as Dean of the College of Science at UTEP. Olander had favored Zajick's removal. Dr. Levitt led a petition drive in support of Zajick's retention. Shortly thereafter, in April 1981, Olander had asked Dr. Levitt to resign. Dr. Levitt had refused. Soon afterward, Dr. Levitt and Olander became embroiled in a dispute over Dr. Levitt's merit pay raise eligibility rating.

5. *Levitt I* at 904.

6. *Id.*

While the appeal from *Levitt I* was still pending before this court, Dr. Levitt filed the instant suit *Levitt II*—on March 18, 1985—under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Dr. Levitt's complaint in *Levitt II* was filed *pro se.*[7] Such a complaint must be read liberally. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652, 654 (1972); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). The District Court did so, and treated Levitt's complaint as "an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* with additional claims asserted under 42 U.S.C. §§ 1981, 1983, and 1985, and the Thirteenth and Fourteenth Amendments to the Constitution of the United States." However, even a liberally-construed *pro se* civil rights complaint must set forth facts giving rise to a claim on which relief may be granted. *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 1496–97, 52 L.Ed.2d 72, 81 (1977). In *Levitt II,* Dr. Levitt again sought review of the very same transaction, his dismissal from employment at UTEP. The particular wrong Dr. Levitt alleges in his original, unamended *pro se* complaint in *Levitt II* is that he was terminated from employment with UTEP because of bias or prejudice against him because he is Jewish. Specifically, he directs the court to transactions between himself and Drs. Olander[8] and Hatch.[9]

UTEP and the individual defendants moved to dismiss *Levitt II,* asserting that the claim of racial or religious discrimination that Dr. Levitt brought in *Levitt II* under Title VII could have been brought in *Levitt I* under 42 U.S.C. § 1983. The District Court granted defendants' motion to dismiss with respect to all the individual defendants on grounds of res judicata, or claim preclusion. The court denied the motion to dismiss with respect to the Title VII claim against UTEP, however, because at the time that Dr. Levitt instituted *Levitt II,* he had not been issued a right-to-sue letter by the EEOC. Such a letter is, under 42 U.S.C. § 2000e–5(f)(1), a prerequisite to bringing suit under Title VII. Dr. Levitt received that right-to-sue letter in December 1984.[10] The District Court later grant-

---

**7.** Dr. Levitt had been represented—or at least assisted—by H. Davidson Smith, the counsel for the American Federation of Teachers in West Texas, in *Levitt I.* Subsequently, Dr. Levitt was later represented by Frank Owen, both at the August 25, 1982 university tribunal hearing on the harrassment allegations and for a time thereafter. Harry Tom Petersen represented Dr. Levitt for at least a portion of 1984, including an appearance for Dr. Levitt before the District Court in *Levitt I.*

For most or all of 1985, Dr. Levitt again was unrepresented, during which time he brought *Levitt II.* John Gates made an unspecified "brief, limited appearance" in this case on January 3, 1986. On February 3, 1986, in response to Dr. Levitt's request, Judge Hudspeth appointed counsel for Dr. Levitt—Stewart W. Forbes and Thomas W. Brady. On February 18, 1986, Levitt filed a *pro se* motion to relieve Forbes and Brady and substitute other counsel, citing "serious personality conflicts" as the reason for the request. Judge Hudspeth allowed Forbes and Brady to withdraw, but denied the motion for appointment of substitute counsel, stating "[i]n a letter which accompanied the motion, [Dr. Levitt] admits that he has neither met nor talked to his appointed attorneys, but is relying entirely upon matters related to him by his wife." John Gates subsequently took up Dr. Levitt's cause, entering his appearance with the

court on April 25, 1986. After Dr. Levitt's death Mr. Gates represented Mrs. Levitt, at least until the February 13, 1987 order of dismissal at issue here. Mrs. Levitt took her appeal in this case *pro se.* At oral argument she was represented by Elwyn Lee, who had become her counsel on October 2, 1987.

**8.** *See* n. 4, *supra.*

**9.** The former Dean of the College of Sciences at UTEP. Dr. Levitt contended that Olander was carrying on discrimination directed against Jews under policies initiated by Hatch.

**10.** There is a factual question, identified but not expressly addressed by the *Levitt II* court on pretrial motion, as to what day Dr. Levitt actually received the right-to-sue letter. The letter is dated December 7, 1984. Dr. Levitt asserts that he received it December 18, 1984. The precise date on which Dr. Levitt did receive the letter is important because 42 U.S.C. § 2000e–5(f)(1) requires that suit on a Title VII claim be brought within 90 days of receiving the right-to-sue letter. The complaint in *Levitt II* was filed on March 18, 1985, which is exactly 90 days after December 18, 1984. We do not address this question because of our holding as to issue preclusion, *infra.*

ed UTEP's motion to dismiss the complaint against it on grounds of collateral estoppel, or issue preclusion, in light of *Hirst v. State of California,* 770 F.2d 776 (9th Cir. 1985).

On appeal, Mrs. Levitt contends that (i) the District Court erred in dismissing the Title VII claim against UTEP in *Levitt II* on grounds of collateral estoppel, or issue preclusion, and (ii) the District Judge should have recused himself in *Levitt II.*[11]

**11.** Dr. Levitt did not move Judge Hudspeth to recuse himself in either *Levitt I* or *Levitt II,* as he could under 28 U.S.C. § 144. 28 U.S.C. § 455, set forth *infra,* substituted for the prior notion of a duty to serve the independent duty of a federal judicial officer to recuse himself when cause to do so exists, whether or not a motion is made.

**12.** 28 U.S.C. § 455 provides in part:
(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
(b) He shall also disqualify himself in the following circumstances:
(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
(2) Where in private practice he served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;
(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(i) Is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) Is acting as a lawyer in the proceeding;
(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

*Recusal*

■ Under 28 U.S.C. § 455(a), a justice, judge, or magistrate of the United States is required to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." Subsection (b) of that same section further requires that he recuse himself in other specified circumstances, none of which applies in this case.[12] The several circumstances which Mrs. Levitt contends triggered a duty for Judge Hudspeth to recuse himself under § 455(a) are set forth in the margin.[13]

**13.** Mrs. Levitt asserts:
(i) "[T]hroughout this case ... [Judge Hudspeth's wife Vicki] was first, an undergraduate, and then most recently a graduate student at [UTEP]."
(ii) Mrs. Hudspeth was a student in the course of another UTEP professor accused of sexual harassment. Dr. Sandra Sue Sawyer was also enrolled in that course. Sawyer was an EEO (affirmative action officer) at UTEP who was investigating the charges against that other professor. When she concluded her investigation, she dropped the course. According to Mrs. Levitt, Mrs. Hudspeth also dropped the course—specifically, that she withdrew following the normal drop period. Such a withdrawal "usually requires permission of the professor or departmental approval."
(iii) Judge Hudspeth received ex parte communications about the case either through his wife or from Dr. Sawyer or other representatives of UTEP. Mrs. Levitt does not elaborate as to precisely what ex parte communications she believes were made to the judge or demonstrate the basis for any knowledge on her part that such communications actually were made. She says only that "it is *thoroughly conceivable* that the lower court judge himself is *biased* as to the facts; he *may* be biased against the person, or he *may* have personal interests or conflicts which impair his objectivity and [which] do not allow him to function as an objective source in the case at bar" and that "[i]t is a *distinct possibility* that [Judge] Hudspeth, [whose wife was] the student of [another UTEP professor accused of sexual harrassment], ... was privy to special knowledge about the activities of [that other professor] which came in the form of student *rumor* and *innuendo* relayed to him in the course of conversations with Mrs. Hudspeth" (emphasis added).
(iv) Judge Hudspeth "received the B.A. and J.D. degrees from the University of Texas [at Austin], was President of the Ex-Students' Association of the University of Texas, [had been] a member of an El Paso law firm which did business at various times for the defendant university and in addition, the Judge, himself is a well known Christian Layman as

In *Health Services Acquisition Corp. v. Liljeberg,* 796 F.2d 796, 800 (5th Cir.1986), we observed that [t]he goal of the disqualification statute is to promote public confidence in the judicial system by avoiding even the appearance of partiality. *Chitimacha Tribe v. Harry L. Laws Co.,* 690 F.2d 1157, 1165 (5th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). In particular, section 455(a) was intended to establish an objective test so that "disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1111 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). *See also Hall v. Small Business Administration,* 695 F.2d 175 (5th Cir.1983); *United States v. Holland,* 655 F.2d 44 (5th Cir. 1981); *Whitehurst v. Wright,* 592 F.2d 834 (5th Cir.1979). The judge can himself decide whether the claim asserted is within § 455. If he decides that it is, then a disinterested judge must decide what the facts are. *See* 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3550 (1984) and the cases cited there.

None of the circumstances to which Mrs. Levitt directs this court's attention rises to the threshold standard of raising a doubt in the mind of a reasonable observer as to Judge Hudspeth's impartiality. There was no duty on the judge's part to recuse himself.

### Title VII Claim

■ The District Court correctly ruled that Dr. Levitt's Title VII suit against UTEP was barred by issue preclusion.

The UTEP tribunal considered Dr. Levitt's testimony and all the other evidence before it, and concluded that Dr. Levitt had indeed made improper advances toward female students enrolled in his classes on several occasions. The tribunal rejected

were President Haskell Monroe of defendant university and Professor Wayne Fuller. The last two persons were named as defendants by original plaintiff in a Section 1983 action also heard by Judge Hudspeth."

(v) Judge Hudspeth was a member of Phi Beta Kappa, and would not wish to embarrass either the national Phi Beta Kappa organization or UTEP by allowing Levitt to expose in the course of the suit what Levitt alleges was Olander's falsification of Olander's own Phi Beta Kappa credentials.

(vi) Judge Hudspeth "consider[ed] for a second time a supplemental motion to a second motion to dismiss which he had already denied without there being additional information asserted or additional law provided." Levitt regards the *Hirst* case cited as not being "additional law" because it "was decided on September 3, 1985, some twelve days after the Judge's August 22, 1985 order allowing this case to stand and where the remaining defendant was [UTEP]. The Judge had notice of the decision on *Hirst* by way of [the slip opinion]."

(vii) "[J]ust prior to trial [Judge Hudspeth's clerk assigned to the Levitt case made a statement] to a witness of Dr. Levitt's and in a social setting. [The clerk] made mention of the fact that the Judge was well aware of his [own] highly conservative background and was trying to be fair in the Levitt case. [The clerk's] statement indicated the *possibility* that the sex harassment charges so offended the Judge's conservative nature that he hated the charges and began to hate the man against whom the charges were directed" (emphasis added).

(viii) Judge Hudspeth "assigned to [Dr. Levitt] the mutually exclusive roles of plaintiff and defendant in the matter which was before the university tribunal which was convened to terminate [Dr. Levitt's employment]." Dr. Levitt was the accused—the defendant, if you will—at the university tribunal hearing, and subsequently was the plaintiff in the *Levitt II* suit in which he protested the action taken at that hearing.

(ix) Mrs. Levitt points to the "Judge's choice of a law firm where one partner was Jewish and the other was of Irish National origin in response to plaintiff's request that the court appoint counsel. He did not select attorneys with a strong record in Civil Rights. Their specialty was Workmen's Compensation. He had at least ten attorneys with extensive Civil Rights practice from which to choose. His choice was dictated by the contrast drawn in one of plaintiff's briefs between the treatment of himself and [another UTEP professor accused of sexual harassment] who was Catholic. This combination of attorneys was selected for the purpose of embarassing them and with the intent of getting them into conflict with one another at the sacrifice of this case."

(x) Finally, Mrs. Levitt points to "the extended period of time between [Judge's] Aug. 22, 1985 Order to Dismiss and his Feb. 13, 1987 Order to Dismiss" as "obviously a calculated dilatory tactic on the part of the Judge to exhaust plaintiff, physically and financially."

Dr. Levitt's contention and made a unanimous finding that good cause existed for the termination of his employment.

The findings of the university tribunal were *not* given preclusive effect in *Levitt I.* Under *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), they could not have been given preclusive effect had Dr. Levitt brought a Title VII claim in *Levitt I.* In *Kremer,* the Court held that (i) preclusive effect *must* be given to a state court's review of a state agency's action on a job bias claim in a later action in federal court on such a claim brought under a similar federal law such as Title VII, (ii) state administrative decisions *must not* be given preclusive effect in a later action in federal court on a Title VII claim, and (iii) it is settled that federal administrative decisions by the EEOC *must not* be given preclusive effect in a later action in federal court on a Title VII claim. After *Kremer,* it was clear that a litigant pursuing a job bias claim was entitled to reach either a state or federal court, and could have that claim foreclosed only after receiving a full and fair opportunity to litigate that claim in either one of those fora.

The District Court in *Levitt I* proceeded to review *de novo* the tribunal's findings, which is all that *Kremer* entitles Dr. Levitt to receive in a Title VII action. In the course of that review, the *Levitt I* trial court examined all the evidence before the university tribunal and made its *own* findings of fact and conclusions of law. *Levitt I* at 904. In particular, the *Levitt I* trial court expressly stated that it had "reviewed the entire record of the testimony before the special hearing tribunal, and [found] it more than sufficient to support the conclusion that [Dr.] Levitt [had] made improper sexual advances toward female students enrolled in his classes on several occasions." *Levitt I* at 908. The *Levitt I* trial court thereby necessarily rejected Dr. Levitt's countervailing contentions made before the university tribunal. Its decision foreclosed Dr. Levitt from later relitigating two issues crucial to a Title VII claim based on his discharge from UTEP: (i) that the charges against him were not a pretext (i.e. that the real motivation for his dismissal was not bias or prejudice against him because he was Jewish),[14] and (ii) that good cause existed to fire Dr. Levitt.[15]

When *Levitt II* was brought, the findings of the university tribunal stood in a different posture. They were then *reviewed* state administrative findings by virtue of the *Levitt I* proceedings. It was therefore possible to give them preclusive effect, if appropriate, because Dr. Levitt had already had the review to which he was entitled under *Kremer.* The District Court considered the question, and concluded that (i) the tribunal did not and could not have heard and determined a Title VII claim by Dr. Levitt,[16] (ii) the District Court in *Levitt*

---

**14.** Where a penalty is imposed by an employer for a particular sort of employee misconduct, the penalty must be applied without discrimination. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 2580 n. 11, 49 L.Ed.2d 493, 502 n. 11 (1976); *Sullivan v. Boorstin,* 484 F.Supp. 836, 842 (D.C. D.C.1980). Mrs. Levitt asserts on this appeal that she could have shown, had *Levitt II* gone to trial, that Dr. Levitt was treated more harshly than gentile individuals who committed the same transgressions. She discusses the case of one other UTEP professor who in the face of similar accusations was allowed quietly to resign and retire. Judge Hudspeth was entitled to consider this distinguishable from Dr. Levitt's situation since in the instance of the other professor, that professor had admitted his guilt and not contested the charges.

**15.** It is evident that there was at least the potential for bad blood between Dr. Levitt and Olan-

der. It is certainly plausible that Olander at some point in their disputes assumed a frame of mind in which he was willing to see Dr. Levitt fired at the earliest moment that good cause to do so existed. Insofar as the record reveals, Olander appears to have been a very strong-willed individual who did not easily tolerate criticism or dissent. Nevertheless, since good cause did exist at the time that Dr. Levitt was dismissed, any antagonism toward Dr. Levitt on Olander's part is not decisive. It could not serve to "contaminate" or otherwise abrogate the good cause for dismissal that did exist. *Blum v. Gulf Oil Corporation,* 597 F.2d 936, 937–38 (5th Cir.1979).

**16.** Unlike the New York State Division of Human Rights whose decisions were at issue in *Kremer,* the university tribunal was not a "state agency having jurisdiction over employment discrimination complaints" generally. *Kremer,* 456 U.S., at 463, 102 S.Ct. 1888, 72 L.Ed.2d 269.

*I* could not have heard and determined a Title VII claim by Dr. Levitt at the time *Levitt I* was filed because Dr. Levitt had not yet received the prerequisite right-to-sue letter,[17] and (iii) Dr. Levitt's Title VII claim therefore was not barred by claim preclusion and could be brought in *Levitt II.* We neither approve nor disapprove that conclusion about claim preclusion. We do not reach the question because the *Levitt II* trial court's subsequent conclusion that the Title VII claim was precluded by issue preclusion is correct.

The *Kremer* decision subsequently was interpreted in *Hirst v. State of California,* 770 F.2d 776 (9th Cir.1985) to encompass issue preclusion as well as claim preclusion.[18] *Hirst* led the *Levitt II* trial court to consider whether Dr. Levitt's Title VII claim was precluded by issue preclusion. As the District Court stated, "[a]lthough this court has previously determined that Dr. Levitt's Title VII claim is not barred by the doctrine of claim preclusion (res judicata) that dismissal did not foreclose the possibility of dismissal on the basis of issue preclusion (collateral estoppel)." The District Court then correctly concluded that the Title VII claim was indeed barred by issue preclusion.

> In the course of [the] ... hearing, Dr. Levitt testified under oath that certain University administrators had brought false charges of sexual impropriety against him, and that these administrators were actually motivated by bias and prejudice against Levitt's Jewish religion.... This is the identical claim being

asserted in the present Title VII action.... [T]he instant case should be dismissed on the basis of the doctrine of issue preclusion or collateral estoppel.

Once a federal court had ruled in *Levitt I* that the charges against Dr. Levitt were not a pretext and that he had made the offensive advances of which he was accused, Dr. Levitt's full and fair opportunity to litigate those issues was over. Those rulings made success on a subsequent Title VII claim impossible.

We independently examine the *Levitt II* complaint, and find that it raises no other issue. It doesn't charge that the UTEP tribunal was biased against Dr. Levitt because he was Jewish or because of his protests.[19] We further hold that there remains no right of action on *any* other ground against UTEP for Dr. Levitt's dismissal.

### So May He Rest

Judicial expositions of the policies underlying both claims preclusion and issue preclusion typically include the notion that parties be spared the expense and vexation of defending themselves against multiple lawsuits based upon essentially the same transaction.[20] Equally typically, such expositions omit a related consideration of equal importance. A lawsuit generally entails considerable expense and vexation for the plaintiff as well, even though it is he who chooses to embark upon the undertaking with the knowledge that he will incur those hardships to himself. Ultimately, claims

---

**17.** *See* text accompanying n. 10, *supra.*

**18.** The portion of the *Kremer* decision which so indicates is:

> The petitioner ... contends that the judgment should not bar his Title VII action because the New York courts did not resolve the issue that the District Court must hear under Title VII— whether Kremer had suffered discriminatory treatment[.] ... Although the claims presented to the NYHRD [New York state administrative agency] and subsequently reviewed by the Appellate Division [of the New York Supreme Court] were necessarily based on New York law, the alleged discriminatory acts are prohibited by both federal and state laws. The *elements* of a successful employment discrimination claim are *virtually identical;* peti-

> tioner could not succeed on a Title VII claim consistently with the judgment of the NYHRD that there is no reason to believe he was terminated or not rehired because of national origin or religion. The Appellate Division's affirmance of the NYHRD's dismissal *necessarily decided* that petitioner's claim under New York law was meritless, and thus it also decided that a Title VII claim arising from the same events would be equally meritless. (emphasis added).

**19.** *See* n. 4, *supra.*

**20.** *See, e.g., Montana v. United States,* 440 U.S. 147, 153–154, 99 S.Ct. 970, 973, 59 L.Ed.2d 210, 217 (1979).

preclusion and issue preclusion operate to the plaintiff's benefit as well. When the fight is once fought hard and well but lost, further fighting harms the fighter perhaps most of all. Then comes the time to look beyond that battle to other more promising enterprises not yet concluded.[21]

> Let him not boast who puts his armor on
> As he who puts it off, the battle done.[22]

AFFIRMED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:

I concur but emphasize that the university tribunal's proceedings were reviewed by the *Levitt I* court. The tribunal's findings are entitled to preclusive effect because they have been judicially reviewed. *See Kremer*, 102 S.Ct. at 1892; *see also University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986) ("Congress did not intend unreviewed state proceedings to have preclusive effect on Title VII claims."). That the university proceedings were reviewed ends the matter as to Dr. Levitt's Title VII claim.

---

21. *Cf. Blonder-Tongue Labs, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 338, 91 S.Ct. 1434, 1447, 28 L.Ed.2d 788, 805 (1971).

22. Longfellow, Morituri Salutamus, st. 9.