Leonard LEVITT, Plaintiff-Appellant,

v.

The UNIVERSITY OF TEXAS AT EL PASO and Haskell Monroe, Individually and as Representative of UTEP, et al., Defendants-Appellees.

No. 84–1700

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

May 10, 1985.

Leonard Levitt, pro se.

Elwyn C. Lee, Univ. of Houston Law Center, Houston, Tex., for plaintiff-appellant.

Jim Mattox, Atty. Gen., Austin, Tex., Michael H. Patterson, Asst. Atty. Gen., San Antonio, Tex., for defendants-appellees.

Before REAVLEY, POLITZ and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Dr. Leonard Levitt alleges that the University of Texas at El Paso, its President, and two of its professors denied him due process of law before he was dismissed from his position as a tenured professor. Levitt had notice and a hearing before a faculty committee prior to his dismissal,

but contends that his hearing did not comport with due process because the faculty committee that heard his case was tainted with the appearance of bias and because the University failed to follow its own rules in conducting the dismissal proceedings. The district court, 590 F.Supp. 902, granted summary judgment in favor of the defendants on all of Levitt's due process claims save those alleging bias, which were tried to the court. The district court dismissed this final claim after finding that there was no actual bias on the part of the faculty committee. We agree with the district court that the appearance of bias, without actual bias of the decisionmaker, does not offend due process, and that Levitt otherwise received the process due under the Fourteenth Amendment. Finding no error in the district court's decision, we affirm.

## I

Levitt was a tenured Professor of Chemistry at the University of Texas at El Paso from 1966 until he was dismissed in December 1982 by the Board of Regents of the University of Texas System. The dismissal stemmed from complaints by Linda Scott, one of Levitt's students, that Levitt had made offensive sexual advances toward her. Three other female students made similar allegations against Levitt after Scott's charges were made public.

University President Haskell Monroe learned of the harassment allegations in early 1982. Pursuant to the procedures established by the Board of Regents of the University of Texas System, President Monroe formed a faculty committee to address the possible termination of Levitt's employment in a formal hearing.[1] Levitt was given notice of the charges that had been made against him and of the witnesses who would testify before the committee. Two alternates on the committee, Professors Fuller and Harris, replaced original panel members when Levitt's hearing was postponed due to scheduling problems of both Levitt and the University.

The hearing was conducted during a total of four days in August and September of 1982. Levitt was allowed to put on witnesses to refute the sexual harassment charges, and he or his lawyer, or both, were present to cross-examine all of the University's witnesses. The faculty committee determined that good cause existed for Levitt's termination and recommended that action to the Board of Regents. The Board of Regents dismissed Levitt in December 1982, and this suit followed.

Levitt's contentions below and on appeal are two-fold. He argues that he was denied due process because Professors Fuller and Harris, both members of the faculty committee that evaluated the harassment charges, were biased, or appeared to be

1. As summarized by the University, the Regents Rules provide the following rights for its faculty.

> [T]he employment of a tenured faculty member may be terminated "only for good cause shown." See *Handbook for Operating Procedure,* Regents Rule 6.3 (1982). When the faculty member sought to be terminated for cause opposes his termination, the Rules require that the accused faculty member be informed in writing of the charges against him and that, on reasonable notice, the charges be heard by a special hearing tribunal appointed by the president of the University. Members of the special tribunal must possess academic rank at least equal to that of the accused faculty member (Regents Rule 6.33). The accused faculty member has the right to appear in person and by counsel of his choice at every hearing held by the special hearing tribunal to confront and cross-examine the

> witnesses against him (Regents Rule 6.331). He has the right to testify and to introduce other evidence in his own behalf (Regents Rule 6.332). A stenographic or electronic record of the proceeding must be filed with the Board of Regents, and the accused faculty member has access to that record (Regents Rule 6.333). The accused may challenge the fairness or objectivity of any member of the tribunal appointed by the University president, but that member has discretion whether to disqualify himself from hearing the matter (Regents Rule 6.335). The hearing tribunal is required to make written findings on the material facts and a written recommendation to the Board of Regents (Regents Rule 6.336). Before the Board of Regents acts on the recommendation of the special tribunal, it must state its decision and the reasons for it in writing and communicate it to the accused (Regents Rule 6.34).

biased, against him.[2] Levitt contends that the due process clause guaranteed him a hearing before a tribunal that was free of both apparent and actual bias. Levitt's second contention, somewhat related to his first, is that President Monroe, in forming the committee, failed to follow the procedures recommended by the University's Committee on Academic Rights, Privileges and Ethics. Although Levitt concedes that President Monroe formed the committee in accordance with the rules dictated by the Board of Regents for the University of Texas System, *see supra* n. 1, he contends that the CARPE Rules constituted a de facto faculty handbook that supplemented the Regents Rules and that the CARPE Rules should therefore have been followed.[3] Even if the Regents Rules were controlling, Levitt contends that they were not followed in all respects. The gist of these last allegations is that any failure of the University to follow its own rules in dismissing Levitt necessarily violated his right to due process.

The district court evaluated the administrative record of the proceedings surrounding Levitt's termination, including the no-

tices sent Levitt before the hearing, the transcript of his hearing, and the committee's letter relating its findings. The court then granted summary judgment in favor of the defendants on all of Levitt's due process claims of improper proceedings in the formation of the hearing committee and in the conduct of the hearing, but ordered a bench trial on the bias allegations.[4]

Harris and Fuller, as well as President Monroe, testified at the trial and explained the incidents that Levitt alleged demonstrated their bias against him. Levitt put on three witnesses who testified in support of his bias theories. The district court accepted the defendants' testimony and concluded that despite Levitt's allegations, he had not been the victim of bias when the committee evaluated the charges brought against him, and that the evidence before the committee amply supported its recommendation that Levitt be terminated.

## II

We enunciated the due process protections to which a tenured professor is entitled before he may be dismissed in *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir.

---

2. Professor Harris' bias allegedly stemmed from Levitt's chairmanship of a faculty committee which, in 1966, had refused Harris' application for membership in the graduate faculty. Professor Fuller had purportedly demonstrated bias against Levitt on three occasions: first, in 1970 he served on a faculty committee that evaluated Levitt's competency; second, in 1978 or 1979 he was part of a committee that denied Levitt a research grant; and third, while serving on a faculty committee that considered Levitt's salary dispute in 1981, Fuller allegedly made statements indicating that he believed allegations that Levitt was guilty of sexual misconduct.

3. The differences between the Regents Rules and the CARPE Rules that are most significant to Levitt's case are those regarding the formation of hearing tribunals to determine the merits of contested termination proceedings. Under Regents Rule 6.33 the President of the University is empowered to appoint a special hearing tribunal whose members possess academic rank at least equal to those of the accused faculty member. President Monroe used his authority under that rule to appoint his own choices to the committee that evaluated the charges against Levitt, a committee Levitt claims was biased.

The CARPE Rules pertinent to the formation of such tribunals are somewhat more detailed. In brief they require the following:

1. All members are to be chosen by lot.
2. All members must be tenured and of a rank at least equal to the accused.
3. All members may have no prior involvement with or knowledge of the issues to be considered.
4. No member can be from the department of the accused.
5. CARPE members are ineligible.
6. Department Chairpersons and other administrators are ineligible.

Had these rules been followed, President Monroe could have exercised no discretion in selecting the hearing committee, and, presumably, the committee could not have been biased against Levitt.

4. The district court first dismissed the University as a defendant on its claim of immunity under the Eleventh Amendment. This left the claims against defendants Monroe, Harris and Fuller in their individual capacities. Levitt appeals the dismissal of the University, but we do not reach this issue because, as we shall explain, there was no due process violation here.

1970). These minimum standards describe the boundaries within which the State has discretion to adopt the procedures it finds most appropriate. These include the right of a professor to: (1) be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges. *Id.* at 856. We address first Levitt's claims of bias and second, his contention that the University failed to follow its own procedures in his dismissal proceeding.

–1–

■ Levitt seizes on the "apparent impartiality" language in the fourth requirement of *Ferguson v. Thomas,* and argues that the district court erred in requiring him to prove actual bias on the part of the faculty committee in order to establish a violation of due process. Even if Fuller and Harris were not actually biased against him, Levitt argues, their very presence on the committee tainted its proceedings with an *appearance* of bias that due process will not tolerate.

We disagree. This court rejected identical assertions in *Duke v. North Texas State University,* 469 F.2d 829 (5th Cir. 1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973), and *Megill v. Board of Regents,* 541 F.2d 1073 (5th Cir. 1976). As we noted in *Megill:* "In *Duke* ... this Court refused to adopt any *per se* rule disqualifying administrative hearing bodies. *The record must support actual partiality of the body or its individual*

*members."* 541 F.2d at 1079 (emphasis supplied).

Levitt attempts to distinguish *Duke* and *Megill* on the ground that both involved assertions of structural bias—that is, a draw upon a pool of decisionmakers whose status presented the appearance of bias, such as university administrators chosen to resolve faculty-administration disputes—and on the ground that neither case involved a tenured professor. These distinctions are unconvincing; both *Duke* and *Megill* followed and applied the due process test set out in *Ferguson* and construed its bias prohibition to interdict only actual bias, not the mere *appearance* of bias. *Accord, Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976) (no due process violation where board of education that engaged in collective bargaining with teachers made decision to fire teachers for striking in violation of state law). *See also Chrysler Corp. v. Texas Motor Vehicle Com'n,* 755 F.2d 1192, 1199 (5th Cir.1985) (dealer members of Texas Motor Vehicle Commission, which resolves consumer-manufacturer disputes under the state's "lemon law," did not have a sufficient stake in those disputes so as to make the Commission a biased decisionmaker forbidden by the due process clause). The district court was correct in requiring proof of actual bias.

After listening to the testimony of numerous witnesses, the district court reached the factual conclusion that, despite Levitt's allegations, *see supra* n. 2, neither defendants Fuller nor Harris, nor any committee members, were actually biased against him. That conclusion is amply supported by the evidence and is not clearly erroneous. Fed. R.Civ.P. 52(a).[5]

---

**5.** After relating much of the testimony by Fuller and Harris that explained the incidents Levitt complained showed their bias, the district judge summarized his findings as follows:

In the instant case, the Court finds that neither Dr. Harris nor Dr. Fuller possessed any bias or prejudice with respect to the allegations of sexual misconduct brought against the Plaintiff. Dr. Harris had demonstrated

his sensitivity to the issue of bias by declining to serve on the merit pay raise committee a year earlier. The fact that he declined to recuse himself from serving on the special hearing tribunal in this case is a strong indication of his impartiality toward the particular charges at issue. He testified in the trial that he reached his verdict as a member of the special hearing tribunal solely on the evidence

–2–

█ Levitt argues alternatively that even if the procedures afforded him satisfied the minimum requirements of *Ferguson v. Thomas*, the University nevertheless violated his procedural and substantive due process rights because it did not follow its own regulations in dismissing him. As explained above, Levitt contends that President Monroe should have followed the CARPE Rules in forming the faculty committee that heard Levitt's case, *see supra* n. 3, and he challenges the district court's decision on summary judgment that the Regents Rules, rather than the CARPE Rules, governed his dismissal. In addition, Levitt argues that even if the Regents Rules were controlling, the district court erred in concluding that they were followed in all respects.[6] His contentions reduce to an assertion that any failure of the University to follow its own rules in his dismissal proceedings necessarily denied him procedural and substantive due process.

█ We reject that assertion. Because the notice and hearing that Levitt received comported with the due process standards of *Ferguson v. Thomas*, we need not decide if he raised an issue of fact as to whether or not the CARPE Rules applied,[7]

nor need we concern ourselves with whether or not the Regents Rules, if controlling, were followed in every detail. The undisputed facts and those found by the district court establish that Levitt received notice of the charges levelled against him and of the witnesses who would testify at his termination hearing, and that he was given a meaningful opportunity to contest those charges before an unbiased tribunal that was qualified to evaluate them. Even if the University failed to follow its own rules, it nevertheless gave Levitt all the process to which he was entitled under the Constitution. Otherwise stated, it matters not whether a tribunal convened under the CARPE Rules would have lacked the appearance of bias, because the Constitution guarantees Levitt only a tribunal that is not *actually* biased; and he was given a hearing before such a tribunal. Nor is it important whether or not Levitt received post-hearing notification of the committee's findings in a letter as detailed as that required by the Regents Rules, for *Ferguson v. Thomas* imposes no such requirement. Levitt's contention that his absence during two days of witness testimony denied him a meaningful opportunity to address the charges against him is the only deficiency

presented at the hearing. The Court finds his testimony in this regard to be entirely credible.

The Plaintiff's evidence with regard to the alleged bias of Dr. Fuller is equally unconvincing. The Plaintiff did call a witness, Dr. Eleanor Duke, to testify that Dr. Fuller had made a statement at a meeting of the faculty committee concerning the merit pay raise which she interpreted as indicating Dr. Fuller's belief that the Plaintiff was guilty of making sexual advances toward his female students. From her testimony as a whole, however, it was obvious that Dr. Duke could not be sure whether the statement that she remembered had been made by Dr. Fuller or by one Dorothy Corona. Furthermore, James Day, another member of the 1981 committee, testified that he had attended most meetings of the committee, and had no recollection of hearing Dr. Fuller make such a statement. Like Dr. Harris, Dr. Fuller testified that he had no bias with respect to the charges against the Plaintiff, and that as a member of the tribunal he found them to be true because he believed the testimony of the female wit-

nesses. As in the case of Dr. Harris, the Court finds Dr. Fuller's testimony to be credible and accepts it as true.

6. Levitt contends that the University failed to follow the Regents Rules in two respects. First, he claims that he was denied the right to confront witnesses at the hearing, a right given him by the Regents Rules, because the University refused to halt the proceedings when he was absent for two days due to medical problems. Levitt also argues that the Regents Rules entitled him to a letter detailing the fact findings of the committee and that the letter sent him was not sufficiently specific.

7. In support of his motion in opposition to the summary judgment Levitt filed three affidavits from faculty members who supported his theory that the CARPE guidelines on the selection of hearing tribunals constituted a de facto faculty handbook that supplemented the Regents Rules. Although these affidavits arguably raised an issue of fact as to whether the CARPE Rules should have been followed, that is an issue we need not decide.

in the University's proceedings that presents a colorable claim of a denial of due process. We agree with the district court, however, that Levitt's absence did not operate to deny him due process. As explained by the district court:

> Plaintiff makes much of the fact that he was not present when some testimony was taken by the tribunal on August 25 and 26. The absence was supposedly because of a sudden exacerbation of the Plaintiff's chronic prostate condition. However, Plaintiff's employed counsel consented to the tribunal's hearing evidence in the absence of the Plaintiff, on the condition that the hearing would then be recessed until a later date to give the Plaintiff an opportunity to produce witnesses and to give his own testimony in refutation of the administration's witnesses. The tribunal agreed to the procedure suggested by the Plaintiff's own attorney. After hearing testimony on August 26, the tribunal recessed the hearing until September 9. Plaintiff was furnished with a transcript of the testimony of all witnesses who had testified in his absence, and had a full opportunity on September 9, and September 16, 1982 to rebut that testimony.

Levitt relies on our statement in *Ferguson* that "[w]hen published rules and regulations establish a particular statutory procedure for the termination of a teacher's employment, they may add to the constitutional minimum," 430 F.2d at 856, *see also White v. South Park Independent School Dist.*, 693 F.2d 1163, 1167 n. 4 (5th Cir. 1982), and decisions from the Tenth and Ninth Circuits to the effect that violations of a university's own *procedural* regulations may constitute a deprivation of *substantive* due process. *See Brenna v. Southern Colorado State College*, 589 F.2d 475, 477 (10th Cir.1978); *Bignall v. North Idaho College*, 538 F.2d 243, 248–49 (9th Cir.1976).

▉ Levitt misconceives the import of our statements in *Ferguson* and *White*. There is not a violation of due process every time a university or other govern-ment entity violates its own rules. Such action may constitute a breach of contract or violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation. *Garrett v. Mathews*, 625 F.2d 658, 660 (5th Cir.1980) ("Even if [a] university depart[s] from its own regulations, not every violation by an agency of [its own] rules rises to the level of a due process claim."). *Accord, United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

The additions to the "constitutional minimum" we referred to in *Ferguson* arise only when the procedures promised are denied in such a manner that the constitutional minimum is itself denied or an independent constitutional deprivation is effected. For example, if a university promised its faculty that it would provide professors two opportunities to challenge decisions to terminate their employment and a professor who relied on that promise forwent the first opportunity to raise his challenge, the university could not deprive him of the second opportunity without violating due process. This would be the case even though the due process clause itself guarantees the professor only one hearing. *Compare Villegas v. INS*, 745 F.2d 950, 951 (5th Cir.1984) (where INS notice procedure afforded illegal aliens only the minimum requirements of due process, there would be a denial of due process if the INS failed to follow its own procedures). *See also Raley v. Ohio*, 360 U.S. 423, 437–38, 79 S.Ct. 1257, 1265–67, 3 L.Ed.2d 1344 (1959) (due process precluded conviction of individuals who refused to answer questions asked by a state investigating commission which itself had erroneously provided assurances that the defendants had a privilege under state law to refuse to answer); *Cox v. Louisiana*, 379 U.S. 559, 569–71, 85 S.Ct. 476, 483–84, 13 L.Ed.2d 487 (1965) (state could not punish individuals for demonstrating "near" a courthouse where police officials had advised the demonstrators that they could meet where they did without violating the statutory pro-

scription against demonstrations "near" the courthouse).

■ The existence of additional protections in the CARPE Rules or even the Regents Rules, beyond those required by due process, and the University's alleged failure to comply with them, did not add to the constitutional minimum here because Levitt was in fact given the process guaranteed him by the Constitution. Because he received notice and a hearing that met the standards of *Ferguson v. Thomas,* whether he is entitled to something more by virtue of the University's own rules is a matter of state law, not constitutional law. *Clark v. Whiting,* 607 F.2d 634, 644–45 (4th Cir.1979) (alternative holding). *Cf. Austin v. Board of Education,* 562 F.2d 446, 452–53 (7th Cir.1977) (compliance with state school code in dismissal of teacher did not answer teacher's assertion that he was deprived of liberty without due process of law).

We recognize that the Tenth Circuit in *Brenna* and the Ninth Circuit in *Bignall* held that where a property interest is taken in accordance with constitutional procedural due process there may nevertheless be a denial of substantive due process if, in taking the property interest, the state refuses to follow additional procedural protections it has promised to afford. We decline to adopt that approach, however, for both logic and precedent counsel against our using the substantive protections of the due process clause to constitutionalize what is otherwise purely a question of state law.

First, we question whether, once property has been taken in accordance with procedural due process, there is any interest left which may be denied in violation of substantive due process. In analogous contexts other courts have declined to extend the protections of substantive due process beyond those of procedural due process. *See, e.g., Jeffries v. Turkey Run Consolidated School Dist.,* 492 F.2d 1, 3–4 (7th Cir.1974) (Stevens, J.) (where teacher had no property interest sufficient to trigger the protections of procedural due process, it was unnecessary to determine whether

school district acted arbitrarily or capriciously in dismissing teacher, for "[c]ertainly the constitutional right to 'substantive' due process is no greater than the right to procedural due process."); *Kilcoyne v. Morgan,* 664 F.2d 940, 942 (4th Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982) (same); *Clark v. Whiting,* 607 F.2d 634, 641–43 (4th Cir. 1979) (same); *Ryan v. Aurora City Board of Education,* 540 F.2d 222, 228 (6th Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977) (same). If Levitt's tenured status was revoked in accordance with procedural due process, we fail to see how the University's failure to afford him additional gratuitous procedural protections it may have promised can present anything more than questions of state law.

As Justice, then Judge, Stevens explained in *Jeffries, supra,* "[t]he claim that a person is entitled to substantive due process means, as we understand the concept, that state action which deprives him of life, liberty, or property must have a rational basis—that is to say, the reason for the deprivation may not be so inadequate that the judiciary will characterize it as 'arbitrary.'" 492 F.2d at 3–4. Although any failure of a state to abide by its own rules could be said to be "arbitrary," the substantive due process analysis is not triggered unless there is a property or liberty interest taken by state action. Levitt's right to continued employment as a tenured professor is unquestionably a property interest protected by the Fourteenth Amendment, but the University did not deny him *that* property right by failing to follow the CARPE Rules or certain aspects of the Regents Rules. All the University has deprived him of, if it has indeed failed to follow its own rules, is his right to have those particular rules followed. The latter right may be supportable by a duty found in state law, but it certainly does not rise to the level of a property or liberty interest protectable by the Constitution. Justice Stevens rejected a similar claim in *Jeffries:*

At one point in her brief, plaintiff seems to argue that, entirely apart from her position as a teacher, as a citizen she has a "substantive right to be free from arbitrary and capricious governmental action." ... She does not identify the source of any such right, but necessarily must be contending that it is an interest in "liberty" protected by the Fourteenth Amendment. Of course, if it were, she would be entitled to procedural due process. In practical terms if her argument were valid, every time a citizen was affected by governmental action, he would have a federal right to judicial review. In view of contemporary reluctance to embrace the concept of substantive due process, ... it would be anomalous indeed to conclude that the same element— "freedom from arbitrariness"—should at once entitle a person to due process and also be a part of the process which is due....

*Id.* at 4 n. 8.

The Tenth Circuit in *Brenna* and the Ninth Circuit in *Bignall*, although recognizing that "not every breach of contract by a state constitutes deprivation of a property interest in violation of the Due Process Clause," *Brenna*, 589 F.2d at 477, failed to distinguish fully between the property interest taken from the professor and his alleged "right" to have the state honor each and every aspect of his contract with it.

Our decision to view the University's decisions here as matters of state law rather than constitutional law is also supported by the Supreme Court's recent decision in *Cleveland Board of Education v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Before that decision, language in some of the Court's opinions suggested that the state could terminate a citizen's enjoyment of property rights with less process than that required by the Constitution if, in creating the property interest, the State had expressly provided procedures by which the right could be terminated. *See Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (opinion of Rehnquist, J.); *Bishop v. Wood*, 426 U.S. 341, 347–50, 96 S.Ct. 2074, 2078–80, 48 L.Ed.2d 684 (1976). The argument in favor of permitting the state to take such action was essentially that the state, as creator of a property right, could determine what procedures it would give before it terminated the right, and if it desired to do so, the state could require those enjoying the right to accept "the bitter with the sweet," that is, less procedural protections than those afforded by the Constitution. The Court rejected that notion in *Loudermill:*

> [I]t is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today. The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett v. Kennedy, supra* [416 U.S.], at 167 [94 S.Ct. at 1650] (Powell, J., concurring in part and concurring in result in part); see *id.*, at 185 [94 S.Ct. at 1659] (White, J., concurring in part and dissenting in part).
>
> In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). The answer to that question is not to be found in [state law].

—— U.S. at ——, 105 S.Ct. at 1493.

The approach taken by the Tenth and Ninth Circuits confounds the premise of

*Loudermill* that the Constitution, not state law, defines the minimum process due. Were we to use a substantive due process theory to require a state to follow its own procedures when it offers more than the constitutional minimum we would be creating a "sweet with the bitter" approach that would blend constitutional protections with those offered by state law in the face of *Loudermill*'s plain effort to keep the two areas distinct. That is not to say that a state can never deprive its citizens of substantive due process by violating its own laws, but we reject Levitt's claim that a state's failure to follow its own rules is a per se deprivation of substantive due process.

### III

The district court correctly concluded that the University of Texas at El Paso, in dismissing Levitt, afforded him all the procedural protections mandated by our decision in *Ferguson v. Thomas*. The Constitution did not guarantee him a decision-maker that was free of the appearance of bias, but only one free of actual bias, and the evidence amply supports the district court's finding that the committee that recommended Levitt's dismissal was not actually biased against him. Nor are Levitt's claims that the University failed to follow its own rules when it discharged him cognizable under the Fourteenth Amendment. Because the procedures given Levitt were constitutionally adequate, any violations by the University of its own rules were at best violations only of state law.

The decision of the district court is AFFIRMED.