Manuel de LLANO, Plaintiff,

v.

Duane BERGLUND, David Danbom, Allan G. Fischer, Michael Garrison, Rick D. Johnson, Andy Keogh, Jim L. Ozbun, Jimmie Richardson, Charles A. Sawicki, and Sharon A. Siverts, Defendants.

No. A3–97–133.

United States District Court,
D. North Dakota,
Southeastern Division.

March 19, 2001.

**1166**

## MEMORANDUM AND ORDER

WEBB, Chief Judge.

### I. Introduction

Before the Court is defendants' motion for summary judgment and motion in limine (doc.'s # 45, 49). Plaintiff has resisted the motions (doc.'s # 56, 60). For the reasons set forth below, defendants' motion for summary judgment is **GRANTED.** Therefore, defendants' motion in limine is rendered **MOOT.**

### II. Background

Dr. Manuel de Llano, the plaintiff in this action, was employed as a professor in the physics department of North Dakota State University (NDSU) from 1985 until 1994; he was tenured in 1989.[1] He was originally hired to chair the department, and he served in that capacity until 1989 or 1990, when he was removed following a request by other members of the department. Without reviewing the details, it is clear that, preceding this request, plaintiff had been involved in a series of disagreements with colleagues over various matters relat-

---

1. As required at the summary judgment stage, the following recitation of facts is drawn from those the parties agree are undisputed or, where there is a dispute, is presented in the light most favorable to plaintiff. See generally *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court notes that its efforts to identify those facts which are disputed and thus must be resolved in favor of plaintiff is made more difficult by the fact that plaintiff did not comply with Local Rule 7.1(B)(2), which requires a party resisting a dispositive motion to file, "separate from the brief, a short and concise statement of the material facts as to which it is contended there exists a genuine issue to be tried." As plaintiff points out, however, "[m]ost of the critical facts in this case are not in dispute." Pl.'s Resp. Br. at 1.

ing to the operation of the department.[2] These disagreements continued after his replacement as chair by Dr. Sawicki, one of the defendants to this action, culminating in a series of written warnings from Sawicki to de Llano concerning his behavior in the department.

These conflicts continued for several years, coming to a head in 1992. On December 3 of that year, Dean Allan G. Fischer, another defendant in this case, issued a Letter of Reprimand to de Llano, criticizing his "poor performance in the classroom and lack of respect for your fellow faculty members which leads to tension and poor collegial relationships...." Dr. de Llano challenged this letter to the NDSU Special Review Committee ("SRC"), which ultimately found the letter justified.[3] Relations between de Llano and his colleagues apparently did not improve: In November 1993 the physics department censured him for verbally harassing the department secretary. Then, in December 1993, de Llano received a second Letter of Reprimand from Dean Fischer, indicating that, if matters did not improve, de Llano faced "sanctions which may include but are not limited to, zero salary raises and seeking your dismissal...." This also apparently did not stem the tide, however; on February 23, 1994, Dr. Sawicki and Dean Fischer provided de Llano with a notice of intent to terminate, and NDSU President Jim L. Ozbun—an-

other defendant here—provided de Llano with a notice of dismissal on March 9.

Dr. de Llano then appealed his dismissal to the SRC by letter dated April 8, 1994. On August 15, 1994, the SRC issued a report recommending that sufficient grounds for his dismissal did not exist. President Ozbun decided to ignore the recommendation and dismissed de Llano despite it on September 22, 1994. Plaintiff strenuously argues that Ozbun did not have the power to do so; this issue will be addressed later. In any case, de Llano appealed Ozbun's decision to the Standing Committee on Faculty Rights ("SCFR"), which held a two-day hearing on April 10–11, 1995. Twelve witnesses testified at the hearing, the transcript of which numbers over 500 pages; de Llano was represented by counsel, who cross-examined NDSU's nine witnesses and called three himself. On May 12, 1995, the SCFR issued its recommendation, which found NDSU had adequate grounds to dismiss de Llano. Ozbun adopted these recommendations on May 15, 1995; de Llano's salary and benefits were then terminated.

Dr. de Llano further appealed this determination to the North Dakota Board of Higher Education. A hearing officer issued recommended findings on December 3, 1996, in which she recommended that the SCFR's determination be upheld. On February 20, 1997, the Board of Higher Education adopted the recommendations, thus completing de Llano's journey through the administrative process. He

**2.** The file in this case makes clear that de Llano was involved in a number of disputes with various individuals at the university for a whole host of reasons. The Court declines to review the precise details of these conflicts, however, because they do not ultimately affect the legal issue before it on summary judgment: Whether there are genuine issues of material fact requiring a trial. Therefore, the Court will refer simply to "conflicts," without attempting to parse the parties' differing ex-

planations of the reasons for them or, frankly, attempting to determine what "really happened" and why. These questions—which veer dangerously close to determining whether the university was justified—are simply outside the scope of this Order.

**3.** The SRC's determination has apparently not been submitted to the Court, but there seems to be no disagreement that it did not uphold de Llano's challenge.

then filed this lawsuit, alleging that various NDSU officers—sued solely in their personal capacities—violated his Fourteenth Amendment Due Process and First Amendment freedom of speech rights.

The First Amendment claim stems from a series of letters to the editor de Llano published in the *Fargo Forum* and the *NDSU Spectrum,* NDSU's student newspaper, from June 1993 to July 1995. In these letters, he expressed his concerns with his treatment as well as other matters. The precise contents of the letters will be discussed in greater detail below, but it is clear that they dealt, at least generally, with de Llano's perceptions of problems at NDSU generally and in the physics department specifically.

## III. Analysis

### A. Summary judgment standard

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of a case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Churchill Bus. Credit, Inc. v. Pacific Mut. Door Co.,* 49 F.3d 1334, 1336 (8th Cir.1995).

The basic inquiry for summary judgment purposes is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." However, the nonmovant must do more than merely restate earlier pleadings. See *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995). Thus, mere arguments or allegations are insufficient to defeat sum-

mary judgment; the nonmoving party must advance specific facts to create a genuine issue of material fact for trial. See, e.g., *F.D.I.C. v. Bell,* 106 F.3d 258, 263 (8th Cir.1997). This requirement is not satisfied by "mere speculation, conjecture, or fantasy"; rather, it requires sufficient probative evidence to allow a finding in its favor, assuming the evidence is established at trial. See *Wilson v. International Business Machines Corp.,* 62 F.3d 237, 241 (8th Cir.1995).

### B. Plaintiff's claims

#### 1. Due process

Plaintiff first claims that defendants violated his rights protected by the Due Process Clause of the Fourteenth Amendment. As the Eighth Circuit recently explained:

The Due Process Clause of the Fourteenth Amendment prohibits state governments from depriving "any person of life, liberty, or property, without due process of law...." This clause has two components: the procedural due process and the substantive due process components. "Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated," and "[t]he possession of a protected life, liberty, or property interest is ... a condition precedent" to any due process claim. "[W]here no such interest exists, there can be no due process violation." Merely labeling a governmental action as arbitrary and capricious, in the absence of the deprivation of life, liberty, or property, will not support a substantive due process claim.

*Singleton v. Cecil,* 176 F.3d 419, 424 (8th Cir.1999) (internal citations omitted) (en banc). Since it is not clear whether plaintiff claims a violation of substantive or

procedural due process, the Court will examine both claims.

### a. Substantive due process

■ Applying these rules, it is readily apparent that plaintiff cannot make out a claim under substantive due process theory. As the Eighth Circuit explained in Singleton, substantive due process "specifically protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Id.* at 425 (citing *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). Thus, substantive due process has generally been limited to "matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Plaintiff's claim for substantive due process based on his job fails to meet this high standard; indeed, the Eighth Circuit has squarely rejected that there is any "occupational liberty" in continued state employment protected by substantive due process, at least for at-will employees. See *Singleton*, 176 F.3d at 427 (declining to extend substantive due process protection to an at-will state employee).

Further, other circuits have arrived at the same conclusion when considering tenured university professors, such as plaintiff. For example, the Third Circuit has explicitly rejected a claim by a tenured professor that his job conveyed a "fundamental property interest entitled to substantive due process protection." *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 142 (3d Cir.2000). In so doing, it noted that

> [T]enured public employment is a wholly state-created contract right; it bears little resemblance to other rights and

property interests that have been deemed fundamental under the Constitution … Nor does public employment approach the interests "implicit in the concept of ordered liberty like personal choice in matters of marriage and family."

*Id.* at 143. This is in accord with the vast majority of circuits which have considered the question. *Id.* at 142 (citing cases in accord from the Second, Fourth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits). Thus, there is a clear majority rule that state-created contract rights are not, in and of themselves, entitled to the protections of substantive due process. Id. Therefore, to the extent plaintiff here relies on substantive due process as the basis for his action, he must fail.

### b. Procedural due process

The analysis of procedural due process claims is quite different than that for substantive due process. As the Eighth Circuit has recently explained, "Procedural due process claims require a two-step analysis. Initially, a plaintiff must demonstrate that the state deprived him of some 'life, liberty, or property' interest. If successful, the plaintiff must then establish that the state deprived him of that interest without sufficient 'process.'" *Krentz v. Robertson*, 228 F.3d 897, 903 (8th Cir. 2000).

■ Unlike substantive due process, the property right allegedly deprived in a procedural due process claim must be "created not by the Constitution, but by an independent source such as state law." *Riggins v. Board of Regents of the University of Nebraska*, 790 F.2d 707, 710 (8th Cir.1986) (citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). However, while the property right must derive from state law, the amount of process due

is judged not by reference to state law, but the Federal Constitution. *Loudermill*, 470 U.S. at 541, 105 S.Ct. 1487. Thus, while de Llano must prove a protected property right by reference to state law, the amount of process he must be accorded is judged by federal, not state, law. *Id.*

The Court has little trouble finding that plaintiff had a protected property right in his job. As the Eighth Circuit has explained, "For a property interest to arise, a government employee must have a 'legitimate claim of entitlement' to continued employment, as opposed to a mere subjective expectancy." *Batra v. Board of Regents of University of Nebraska*, 79 F.3d 717, 720 (8th Cir.1996). Here, plaintiff became tenured in his position in 1989. Courts have generally agreed that tenure gives a college professor an expectation of continued employment sufficient to confer on the job the status of a property right. See *Geddes v. Northwest Mo. State Univ.*, 49 F.3d 426, 429 (8th Cir.1995) ("Absent unusual circumstances, a teacher in a position without tenure or a formal contract does not have a legitimate entitlement to continued employment.") Indeed, defendants appear not to dispute that deLlano had a property interest in his job that entitled him to due process. The issue thus becomes whether plaintiff received the process he was due.

The Supreme Court has made clear that "[t]he essential requirements of due process ... are notice and an opportunity to respond." *Lowdermill*, 470 U.S. at 546, 105 S.Ct. 1487. Thus, under the Constitution, irrespective of what rights he or she may enjoy under state law, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* It is clear that de Llano enjoyed these opportunities here.

Simply reviewing the facts makes clear that de Llano received ample due process. He clearly had knowledge of the background problems between him and his colleagues based on the letters from Dr. Sawicki in July and August 1992. He then received a letter of reprimand from Dean Fischer in December 1992, which he contested to the SRC. He was censured by the physics department in November 1993, and he received a second letter of reprimand in December of that year. Clearly, then, he had a general background of the problems that ultimately led to his dismissal.

Then, in February 1994, he received a notice of intent to terminate, a notice which included six separately numbered bases for the decision. The March 1994 dismissal letter from President Ozbun reiterated these six points. Thus, there can be no question that he had notice of the specific charges against him. He then obtained counsel, who represented and assisted him throughout the remainder of the process. He also has had three separate appeals: The SRC, the SCFR, and the North Dakota Board of Higher Education. Before the SCFR, he was able to call and cross-examine witnesses and present evidence on his behalf. Surely, this qualifies as an "opportunity to be heard" under any sensible definition of the phrase.

Eighth Circuit opinions have rejected procedural due process complaints in instances in which less process than de Llano received here was afforded. For example, in *Riggins*, the court denied a procedural due process claim when the employee was allowed to read a report alleging misconduct on her part and received an hour and forty minute oral hearing with her supervisor. *Riggins*, 790 F.2d at 709–11 ("The pretermination process given *Riggins*, while it did not amount to a formal hearing, satisfies the

due process requirements of *Loudermill*"). Similarly, the Eighth Circuit has upheld against procedural due process attack the dismissal of a tenured university professor who "received prior notice of the charges against him and was represented by counsel in all subsequent proceedings," at which he "took full advantage of his rights to present evidence and to call and cross examine witnesses". See *Agarwal v. Regents of the University of Minnesota*, 788 F.2d 504, 508 (8th Cir. 1986). In light of these and similar proceedings, it is apparent that because deLlano unquestionably had ample notice of the charges against him and several opportunities to be heard, he received procedural due process. *Id.*

Dr. de Llano argues, however, that he was denied procedural due process because NDSU violated its own procedures during the administrative review process. Specifically, he argues President Ozbun had no authority to decide not to follow the recommendation of the SRC that de Llano should not be terminated and that the SCFR, which ultimately found against deLlano, was improperly constituted. Pl.'s Resp. Br. at 10–11, 13. Thus, he maintains that NDSU violated its own procedures, which worked to deprive him of procedural due process. Without deciding whether or not NDSU violated its own procedures, the Court concludes that it must reject de Llano's argument.

Initially, this argument simply misses the crucial division in this area of law: While state law controls whether a public employee has a property interest in continued employment protected by procedural due process, the law used to evaluate the process that is due is exclusively federal. See *Loudermill*, 470 U.S. at 541, 105 S.Ct. 1487. In short, as the Eighth Circuit has explained: "[O]nce a liberty interest has been found, federal law, not state law, determines what constitutes adequate pro-

cedural due process." *Franco v. Moreland*, 805 F.2d 798, 801 (8th Cir.1986) (citing *Loudermill*). Thus, this Court must apply federal standards to determine whether de Llano received sufficient due process, most importantly notice and an opportunity to be heard. The Court has concluded that he did. Therefore, de Llano has received procedural due process, irrespective of whether NDSU followed its internal procedures.

Eighth Circuit precedent, while not answering squarely the question de Llano poses, reinforces this conclusion. For example, in a case dealing with a student dismissal from a graduate program, the Eighth Circuit held that the "University's noncompliance with its own grievance appeal procedures would not violate [plaintiff's] right to procedural due process, because the hearing she received at the department level exceeded the process constitutionally required...." *Schuler v. University of Minnesota*, 788 F.2d 510, 515 (8th Cir.1986). While the amount of process due and afforded is different in *Schuler* than in the instant case, the point stands that deviation from an internal process is only a procedural federal due process violation if it has the effect of denying the aggrieved party the process due under federal standards. *Id.*

Other courts that have considered this very argument within the context of universities have reached a similar conclusion. For example, the First Circuit has held that, even if a university deviates from its procedures, it is not subject to a procedural due process attack so long as "the procedures the University actually follows are fair ones." *Newman v. Burgin*, 930 F.2d 955, 960 (1st Cir.1991). Thus, the focus is on evaluating what actually happened in light of federal standards, not the policy allegedly violated. *Id.*; accord *Silva v. University of New Hampshire*, 888

F.Supp. 293 (D.N.H.1994). Similarly, the Fifth Circuit has rejected a procedural due process attack based on a claimed violation of university policy, emphasizing that the controlling question was compliance with federal due process standards, which the court found were met. *Levitt v. University of Texas at El Paso*, 759 F.2d 1224, 1229 (5th Cir.1985).

These cases support the Court's conclusion that, assuming de Llano is right that NDSU violated its procedures, this cannot help him, since he did in fact receive all the process to which he was due under the Constitution. Rather, the issue is whether de Llano received notice and an opportunity to be heard, the Court concludes he did. Further, the Court notes that de Llano received at least one more hearing after each stage of the proceedings he claims was tainted; he went before the North Dakota Board of Higher Education after the SFRC's decision, and to both of them after Ozbun's decision. Courts have suggested that flawed hearings may be cured by a later, constitutionally adequate procedure. See *Agarwal*, 788 F.2d at 508 (noting that the fact the protections of the Fourteenth Amendment may not have been observed before one committee did not establish a violation "in light of the formality of the later proceedings"). Thus, even assuming that there was a violation of NDSU's procedures, de Llano received constitutionally adequate process, both overall and after each alleged violation. In light of these facts, de Llano's contention that his rights were violated must be rejected.

Plaintiff cites *Brady v. Gebbie*, 859 F.2d 1543 (9th Cir.1988) for his contention that he should be allowed to show the process accorded him was a sham. Pl.'s Resp. Br. at 9. Plaintiff misreads this case, however. The plaintiff in *Brady* was held not to have any property interest in his job. Rather, he went to the jury on the theory that his firing deprived him of a liberty interest, a theory which has not been so much as alleged here. *Brady*, 859 F.2d at 1547. Thus, the case is distinguishable and does not help plaintiff. *Id.*

In conclusion, then, the Court **GRANTS** defendants' motion for summary judgment as to plaintiff's procedural due process claim. Plaintiff received all the process due him under federal constitutional standards: He clearly had notice of the charges against him, and he had several opportunities to be heard. Further, his allegation that NDSU violated its own procedures in unavailing, since the standard remains whether he received sufficient process under federal standards.

### 2. First Amendment

■ Plaintiff next claims his firing was retaliation for exercise of his First Amendment rights, mainly through a series of letters to the editors in local newspapers. In his complaint, he identifies the following letters as leading to his firing:

1. Letter to the *Fargo Forum*, "It's a crisis of leadership at university," 6/20/93;

2. Open letter sent to President Ozbun, "Questions for an NDSU dean from a concerned state taxpayer," 9/11/93;

3. Letter to the *Spectrum*, NDSU's campus paper, "Will SU faculty be consulted for its new leadership," 9/28/93;

4. Letter to the *Fargo Forum*, "University should reinstate Specht," 12/31/93;

5. Letter to the *Fargo Forum*, "NDSU must pursue standards of excellence," 2/18/95;

6. Letter to the *Fargo Forum*, "No one at university is above accountability," 5/5/95;

7. Letter to the *Fargo Forum*, "Free speech rights quashed by NDSU dean," 7/27/95;

The standards for evaluation of § 1983 First Amendment claims are well established. Plaintiff must "establish the First Amendment protects the speech and the protected speech was a substantial factor in the adverse employment action." *Bausworth v. Hazelwood School District*, 986 F.2d 1197, 1198 (8th Cir.1993). The Eighth Circuit recently explained this first step:

> Whether the First Amendment shields a public employee from discharge as a result of her speech requires a two-step judicial inquiry. First, we determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." Second, if the speech addresses a matter of public concern, we balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

See *Belk v. City of Eldon*, 228 F.3d 872, 878 (8th Cir.2000) (citations omitted).

Thus, de Llano must establish that his speech addressed matters of public concern. *Id.* "Matters of public concern include matters of political, social, and other concern to the community." *Id.* In employing this framework, derived from *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708(1983), courts must examine the "content, form, and context of the speech as revealed by the entire rec-

ord." *Id.* (citing *Connick*). Only if speech meets this standard does the court perform the balance mandated by *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Then, if the plaintiff prevails, he must demonstrate that the speech was a motivating factor in his discharge. See *Bausworth*, 986 F.2d at 1198. Finally, the defendant has a chance to show it would have made the same decision regardless of the speech. See generally *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

■ Initially, the Court notes the July 27, 1995 letter to the *Forum* entitled "Free speech rights quashed by NDSU dean" cannot, under any circumstances, be considered in this analysis. The final decision by President Ozbun to terminate de Llano was made on May 15, 1995, following the SCFR report of May 15, 1995. Clearly, a letter published two months after a final termination decision cannot have been the basis for that decision. See *Bausworth*, 986 F.2d at 1198 (noting that plaintiff must prove the speech was a motivating factor in the adverse employment action). The Court will therefore not consider this letter.[4] This leaves six letters, which the Court addresses below.

*a. "It's a crisis of leadership at university," Fargo Forum, 6/20/93*

This letter is typical of the themes that will define this analysis. Clearly, it contains elements which appear to address matters of public concern. It is couched in generalities, which further seems to sug-

---

**4.** It is tempting, in fact, to ignore all letters after March 9, 1994, when NDSU President Ozbun issued the initial letter of termination, as it is unlikely the later reviews of this decision considered new information. However, the Court will not do so, since the termination did not become final until over a year later, and de Llano was an active speaker in the interim. Further, while the defendants urge the Court to ignore the final letter—as it will do—they seem to agree that the letters between March 9, 1994 and May 15, 1995 are relevant.

gest that it is of public concern. At bottom, however, it is not of public concern; rather, it is devoted to airing de Llano's personal grievances with NDSU, containing the speech of an employee, not a member of the public. See *Bausworth*, 986 F.2d at 1198 ("[S]peech is a matter of public concern when a public employee speaks as a concerned citizen, but not when the employee speaks as an employee.")

The Court must examine the content, form and context of the speech at issue. Id. The form and context weigh in favor of a finding of public concern: A newspaper is a public forum and letters to the editor are traditional means of communicating with the public. It is the content of the letter, however, which undercuts its claim to address matters of public concern. Though it begins with an invocation of concern for the future of NDSU generally, it becomes a series of complaints about low salaries, research policies, and the relationship between research, publications, and tenure.

These are all matters about which de Llano had long complained: He had a long-running dispute with others in his department and the university on the subject of research and publication, as he believed they—and accordingly he—were undervalued. The letter also complains about "removal of department chairmen with exceptional credentials in mid-academic year, in violation of their contracts"; de Llano himself had been removed as chairman in mid year three years earlier. The letter further contains an indictment of NDSU's Equal Employment Opportunity Services office, with which de Llano had a running feud. In short, then, the letter is a series of long-running complaints de Llano had with various issues at NDSU, complaints not of public concern but rather peculiar to him.

These are the kinds of complaints courts have consistently held not to be matters of public concern. Several of the issues raised by the letter—the relationship between research and tenure, the replacement of department chairs—relate to personnel matters, and "[s]tatements that deal with personnel matters are not generally protected by the First Amendment." See *Belk*, 228 F.3d at 879. Much of the speech also relates to "internal policies relevant only to fellow employees," which the Eighth Circuit has held is not generally protected. See *Calvit v. Minneapolis Pub. Schs.*, 122 F.3d 1112, 1117 (8th Cir. 1997). Finally, the Court notes that de Llano clearly had a personal stake in the issues he raised, a fact which often cuts against a finding of public concern. See *Belk*, 228 F.3d at 879 ("[S]tatements of 'purely academic interest' to the speaker will be given more protection than those in which she has a personal interest"); see also *Tuttle v. Missouri Dep't. of Agric.*, 172 F.3d 1025, 1034 (8th Cir.1999) (concluding that plaintiff spoke only as an employee and not as a citizen).

In short, this letter was an expression of de Llano's idiosyncratic concerns and problems with NDSU. These concerns may be couched in terms of generalities, but they remain, ultimately, his concerns. Further, these are the concerns of an aggrieved employee, not those of a member of the public. Therefore, the letter does not address matters of public concern within the meaning of *Connick*, and it is hence unprotected by the First Amendment. This fact is not altered by the letter's general references to funding and the overall direction of NDSU.

b. *"Questions for an NDSU dean from a concerned state taxpayer," open letter to Ozbun, 9/11/93*

Many of the above concerns are equally—if not more—true for this letter.

While it begins couched in generalities, it soon becomes merely a lading list of de Llano's complaints. In it, he takes issue with, among other issues, the allocation of travel money within departments, rewards for research, and the criteria for department chairmen—all longstanding complaints of de Llano's, recitation of which is not protected for the reasons cited above. See, e.g., *Calvit*, 122 F.3d at 1117 (noting internal complaints of interest only to other employees are not generally matters of public concern). It also contains a series of complaints about poor treatment of the physics department, an internal complaint which is not a matter of public concern. *Id.*

Finally, it degenerates into a series of accusations against the dean, suggesting that a student letter seeking a course alternative to one of de Llano's classes— another personal sore point—was fabricated by the dean and that the dean altered minutes of meetings. These criticisms of a supervisor in his role as supervisor—especially when the speaker has a strong interest in the subject—are not generally matters of public concern. See generally *Belk*, 228 F.3d at 879 (distinguishing between criticism of a supervisor as a supervisor and as a public official). Thus, the content of the letter suggests it is not of public concern.

Further, the form of the speech weighs against it. It is clear that private communications are not automatically exempt from the First Amendment and must receive the same analysis as public communications. See *Buazard v. Meridith*, 172 F.3d 546, 549 (8th Cir.1999). However, "the internal nature of [an employee's] speech is ... a factor to be considered." *Id.* Thus, the fact that the speech was conveyed solely to two university officials, especially when coupled with the Court's analysis of its content, undercuts its claim

to address a matter of public concern. In light of these factors, the Court concludes the letter does not address a matter of public concern and is hence unprotected.

c. *"Will SU faculty be consulted for its new leadership," The Spectrum, 9/28/93*

The Court recognizes that this letter may be a closer call than the last two. It also recognizes that these kinds of calculations cannot be done with arithmetic precision. However, the Court concludes that, on balance, this letter does not address matters of public concern. Again, it is replete with individualized complaints: de Llano's perception that research was not sufficiently rewarded by NDSU; his view that he was unfairly treated when he was not allowed to bring a Brazilian scientist to NDSU; and his dissatisfaction with the NDSU affirmative action office. These complaints are reflections of de Llano's personal grievances and relate mostly to internal policies, both facts that undercut his public concern claim. See *Calvit*, 122 F.3d at 1117 (noting speech on internal employment matters generally not public concern); *Belk*, 228 F.3d at 879 (noting that statements of "academic interest" to the speaker are given more protection).

The letter then embarks on a three-paragraph condemnation of the "lack of trust, confidence—and, hence, communication-between faculty and administrators." The letter accuses administrators of "formulating and imposing their own pet policies, rather than implementing the university's." He calls on the administration to give the faculty a larger role in campus policy generally, and he concludes by calling for the prompt selection of a university president.

These themes appear at first blush to address matters of public concern. However, the Court concludes the letter over-

all is not entitled to protection. The first half is not of public concern—see above—and this changes the context of the later speech. See *Bausworth*, 986 F.2d at 1198 (noting that courts must examine the "content, form and context" of speech). Further, the second half revolves around deLlano's perception of the presidential selection process from his perspective as a faculty member, and thus as an employee, not as a member of the public. It is well established that "speech is a matter of public concern when a public employee speaks as a concerned citizen, but not when the employee speaks as an employee." *Id.* This undercuts his argument, leading the Court to find the letter is not protected.

*d. "NDSU must pursue standards of excellence," Fargo Forum, 2/18/95*

Much of the foregoing analysis applies with equal force to this letter. Though devoid of personal attacks, it too is written from a uniquely faculty perspective, thus suggesting it is spoken as an employee and not as a member of the public. *Id.* Further, it reflects de Llano's underlying grievances with perceived weak academic standards and his view that research is "currently undervalued at NDSU." These are internal and faculty complaints, not those of a concerned citizen. *Id.*; see also *Calvit*, 122 F.3d at 1117. Therefore, the Court concludes it is not protected.

*e. "University should reinstate Specht," Fargo Forum, 12/31/93 and "No one at university is above accountability," Fargo Forum, 5/5/95*

The Court addresses these letters together because they suffer the same flaw: Lack of connection to the underlying issues presented in this litigation. Therefore, assuming without deciding that plaintiff could pass both the *Connick* public

concern requirement and the *Pickering* balance on these letters, the Court holds that he could not show that the letters were a motivating factor in the defendants' decision to terminate him. See *Bausworth*, 986 F.2d at 1198.

The first letter (*"University should reinstate Specht"*) is generally critical of the university, but it criticizes a university decision with regard to another faculty member, not de Llano. Further, the Court cannot find any trace of the issue raised by this letter anywhere else in the record, at least not as a major issue; it appears only in this letter and does not appear to be mentioned again. Thus, it is a bare incident of speech unconnected to the claim, and plaintiff cannot show it was a motivating factor in his discharge. See *Bausworth*, 986 F.2d at 1198. Even at the summary judgment stage, a nonmoving party must advance specific facts to create a genuine issue of material fact for trial, not "mere speculation, conjecture, or fantasy." See *Wilson*, 62 F.3d at 241, Bell, 106 F.3d at 263. This plaintiff has failed to do with regard to this letter.

The same holds true with regard to the second letter (*"No one at university is above accountability"*), so the Court will not repeat its analysis. The Court does note briefly, however, that this letter is not even vaguely critical of NDSU; rather, it is an attack on the editorial position of the newspaper in which it was published. Thus, there is not even a general suggestion that it led to a retributive attack on de Llano from NDSU, and this letter thus cannot support the position that plaintiff was fired for writing it. See *Bausworth*, 986 F.2d at 1198.

In conclusion, therefore, the Court holds that none of these letters pass the *Connick* public concern requirement. Therefore, they are not entitled to First Amendment protection. This obviates the need to per-

form the Pickering balancing test—in which de Llano's interest in speaking would be weighed against NDSU's interest in workplace efficiency—since he has not passed the public concern threshold. See *Belk*, 228 F.3d at 878 (reviewing analytical framework). Therefore, this issue will not be addressed further.

Assuming that the Court concluded that de Llano could pass both *Connick* and *Pickering*, however, it would likely conclude both that the speech was not a motivating factor in his discharge and that the NDSU would have terminated de Llano irrespective of his speech. The Court notes that de Llano has pointed to nothing in the record that would support his contention that these six letters led to his termination. While the nonmovant's burden at summary judgment is not a heavy one, it is not satisfied by "mere speculation, conjecture, or fantasy." See *Bell*, 106 F.3d at 263. Rather, he must at least point to specific facts to create a genuine issue of material fact for trial. *Wilson*, 62 F.3d at 241. This plaintiff has singularly failed to do.

Second, the Court notes NDSU could likely prove it would have terminated de Llano regardless of the speech at issue.[5] NDSU offered six reasons for terminating de Llano in the notice of intent to terminate, reasons reiterated in the ultimate notice of dismissal. These reasons do not reflect, on their face, a concern for de Llano's speech, and the record would seem to substantiate several of them. This at least suggests that the actions by NDSU were not driven entirely by de Llano's speech.

More important, perhaps, is that a review of the events in this case—not performed in detail here—indicates that de Llano's problems with NDSU developed in part over the four-year period between his removal as chair in 1989 and his first speech in 1993; while it may have gone downhill from that point, it was already in serious decline. Thus, this is not a case in which a model employee speaks out and is suddenly beset by problems; rather, the speech and the problems seem to be separate or, at most, concurrent. This provides further support for the Court's conclusion that summary judgment is appropriate.

## IV. Conclusion

For the reasons set forth above, the Court **GRANTS** defendants' motion for summary judgment. Therefore, defendants' motion in limine is rendered **MOOT.**

**IT IS SO ORDERED.**

---

5. The Court asked the parties to submit addi- tional briefing on this point.